IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ARMSTER HAMPTON,

       Plaintiff,                     No. 2:06-cv-0966 JAM KJN P

    vs.

P. SAHOTA, et al.,

       Defendants,             FINDINGS AND RECOMMENDATIONS

_____/

I. <u>Introduction</u>

       Plaintiff, a state prisoner proceeding without counsel, seeks relief pursuant to 42 U.S.C. § 1983.  Plaintiff alleges that he received inadequate medical care in violation of the Eighth Amendment and state law.

       Pending before the court is defendants' summary judgment motion filed December 18, 2009.  (Dkt. No. 45.)  On March 23, 2010, plaintiff filed his opposition.  (Dkt. No. 53.)  On June 3, 2010, defendants were ordered to file either a statement that they intended to stand on the pending summary judgment motion or a supplemental summary judgment motion. (Dkt. No. 54.)  On July 26, 2010, defendants filed a supplemental summary judgment motion. (Dkt. No. 57.)  On August 19, 2010, plaintiff filed an opposition to the supplemental motion. (Dkt. No. 59.)

1    After carefully considering the record, the undersigned recommends that

2  defendants' summary judgment motions be granted in part and denied in part.

3  II.  Legal Standard for Summary Judgment

4    Summary judgment is appropriate when it is demonstrated that the standard set

5  forth in Federal Rule of Civil Procedure 56(c) is met.  "The judgment sought should be rendered

6  if . . . there is no genuine issue as to any material fact, and that the movant  is entitled to

7  judgment as a matter of law."  Fed. R. Civ. P. 56(c).

8    Under summary judgment practice, the moving party

9       always bears the initial responsibility of informing the district court
        of the basis for its motion, and identifying those portions of "the
10      pleadings, depositions, answers to interrogatories, and admissions
        on file, together with the affidavits, if any," which it believes
11      demonstrate the absence of a genuine issue of material fact.

12  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

13  burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

14  in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on

15  file.'"  Id. (quoting Fed. R. Civ. P. 56(c).  Indeed, summary judgment should be entered, after

16  adequate time for discovery and upon motion, against a party who fails to make a showing

17  sufficient to establish the existence of an element essential to that party's case, and on which that

18  party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

19  concerning an essential element of the nonmoving party's case necessarily renders all other facts

20  immaterial."  Id. at 323.  In such a circumstance, summary judgment should be granted, "so long

21  as whatever is before the district court demonstrates that the standard for entry of summary

22  judgment, as set forth in Rule 56(c), is satisfied."  Id.

23    If the moving party meets its initial responsibility, the burden then shifts to the

24  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

25  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

26  establish the existence of this factual dispute, the opposing party may not rely upon the

allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts....Where the record taken as a

3

1  whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

2  issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

3  III.  Legal Standard for Eighth Amendment Claim

4          In order to state a § 1983 claim for violation of the Eighth Amendment based on

5  inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

6  deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976).

7  To prevail, plaintiff must show both that his medical needs were objectively serious, and that

8  defendants possessed a sufficiently culpable state of mind. Wilson v. Seiter, 501 U.S. 294, 299

9  (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand).  The requisite state of

10 mind for a medical claim is "deliberate indifference." Hudson v. McMillian, 503 U.S. 1, 4

11 (1992).

12          A serious medical need exists if the failure to treat a prisoner's condition could

13 result in further significant injury or the unnecessary and wanton infliction of pain.  Indications

14 that a prisoner has a serious need for medical treatment are the following:  the existence of an

15 injury that a reasonable doctor or patient would find important and worthy of comment or

16 treatment; the presence of a medical condition that significantly affects an individual's daily

17 activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900

18 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01

19 (9th Cir. 1989). McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other

20 grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

21          In Farmer v. Brennan, 511 U.S. 825 (1994), the Supreme Court  defined a very

22 strict standard which a plaintiff must meet in order to establish "deliberate indifference."  Of

23 course, negligence is insufficient.  Farmer, 511 U.S. at 835.  However, even civil recklessness

24 (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should

25 be known) is insufficient.  Id. at 836-37.  Neither is it sufficient that a reasonable person would

26 have known of the risk or that a defendant should have known of the risk.  Id. at 842.

4

It is nothing less than recklessness in the criminal sense—subjective standard—disregard of a risk of harm of which the actor is actually aware.  Id. at 838-42.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at 847.  "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  Id. at 842.  If the risk was obvious, the trier of fact may infer that a defendant knew of the risk.  Id. at 840-42.  However, obviousness per se will not impart knowledge as a matter of law.

Also significant to the analysis is the well established principle that mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

Moreover, a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case.  Id.

Additionally, mere delay in medical treatment without more is insufficient to state a claim of deliberate medical indifference.  Shapley v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 408 (9th Cir. 1985).  Although the delay in medical treatment must be harmful, there is no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060, citing Wood v. Housewright, 900 F.2d 1332, 1339-40 (9th Cir. 1990), and Hudson, 503 U.S. at 4-6.  A finding that an inmate was seriously harmed by the defendant's action or inaction tends to provide additional support for a claim of deliberate indifference; however, it does not end the inquiry.  McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992).  In summary, "the more serious the medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those

5

1   needs, the more likely it is that a plaintiff has established deliberate indifference on the part of

2   the defendant." McGuckin, 974 F.2d at 1061.

3          Superimposed on these Eighth Amendment standards is the fact that in cases

4   involving complex medical issues where plaintiff contests the type of treatment he received,

5   expert opinion will almost always be necessary to establish the necessary level of deliberate

6   indifference. Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988). Thus, although there

7   may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the

8   treatment he received equated with deliberate indifference thereby creating a material issue of

9   fact, summary judgment should be entered for defendants. The dispositive question on this

10  summary judgment motion is ultimately not what was the most appropriate course of treatment

11  for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence,

12  criminally reckless.

13  IV.  Discussion

14         This case is proceeding on the first amended complaint filed October 20, 2008

15  against defendants Dr. Cardeno, Dr. Dazo and Dr. Lee. (Dkt. No. 37-2.) At all relevant times,

16  plaintiff and defendants were located at Folsom State Prison ("Folsom"). Plaintiff alleges that

17  defendants violated his Eighth Amendment right to adequate medical care. Plaintiff also alleges

18  a violation of state law. Plaintiff seeks money damages and injunctive relief. The gravamen of

19  this action is plaintiff's claim that defendants failed to provide him with adequate medical care

20  following his July 2005 thyroidectomy which he received while housed at California State

21  Prison-Corcoran.

22         Defendants do not dispute that plaintiff received this surgery, but contend that

23  following his transfer to Folsom in September 2005 he received adequate medical care.

24  ////

25  ////

26  ////

A. <u>Defendant Cardeno</u>

*Plaintiff's Allegations*

Plaintiff's claims against defendant Cardeno can be broken down into the following five categories.

First, plaintiff alleges that defendant Cardeno failed to provide adequate oncological treatment including I-131 Metastasis Scans and I-131 Radiation Ablation Therapy following his surgery.  In support of this claim, plaintiff alleges that following his July 25, 2005 thyroidectomy Dr. Schuster, who performed the surgery, told plaintiff that he had thyroid cancer and that he needed further testing to determine whether it had spread.  (Dkt. 37-2, p. 7.)  Attached to the amended complaint as Exhibit C is an entry in plaintiff's medical records by Dr. Schuster dated July 25, 2005.  In this entry, Dr. Schuster wrote that the plan was for plaintiff to have an oncology consultation.

Apparently the further testing was not performed prior to plaintiff's transfer to Folsom in September 2005.  Plaintiff alleges that he saw defendant Cardeno four times following his arrival at Folsom.  (<u>Id</u>., p. 8.)  Plaintiff told defendant Cardeno of his desire for oncology treatment and also that he suffered symptoms that he believed were the results of levothyroxine, a thyroid hormone replacement medication.  (<u>Id</u>.)  Plaintiff alleges that defendant Cardeno did not order further oncological testing.  (<u>Id</u>.)

Plaintiff alleges that he finally was seen for an oncology consultation at the U.C. Davis Medical Center on July 25, 2006.  (<u>Id</u>., p. 13.)  At that time, Dr. Rubin ordered two rounds of blood work and that plaintiff's thyroid medication to be suspended for thirty days.  (<u>Id</u>.)  When plaintiff returned to U.C. Davis for a follow-up visit, the blood work results had not been sent with plaintiff.  (<u>Id</u>.)  When Dr. Rubin spoke with defendant Lee regarding the missing blood work, defendant Lee told him that it could not be located.  Dr. Rubin then re-issued his order for the blood work.  (<u>Id</u>.)

Plaintiff alleges that defendant Cardeno, as the Chief Medical Officer, "failed to

7

1 ensure and provide what was necessary to make these appointments to U.C. Davis Medical

2 Center a part of plaintiff's effective, proper and necessary health care." (Id., p. 14. )

3      In his second claim, plaintiff alleges that defendant Cardeno did not ensure that

4 plaintiff had a consistent primary care physician as a result of which plaintiff received inadequate

5 medical care. In support of this claim, plaintiff alleges that in July 2006 he was seen by Dr. Bal

6 at Folsom for a medical return evaluation. (Id., p. 14.) Plaintiff told Dr. Bal that he believed that

7 his treatment by different doctors caused his missing blood work. (Id.) Dr. Bal told plaintiff that

8 she was aware of the problem and would now become his primary care physician. (Id.)

9 However, at plaintiff's next appointment Dr. Bal told plaintiff that she had to take a leave of

10 absence and that he would be seen by Dr. Dunlap. (Id.) Plaintiff alleges that defendant Cardeno

11 violated his Eighth Amendment rights by refusing to designate a specific physician to oversee

12 plaintiff's care. (Id., p. 15.)

13      In his third claim, plaintiff alleges that defendant Cardeno did not ensure that he

14 received a low iodine diet. In support of this claim, plaintiff alleges that on October 13, 2006, he

15 was seen by Dr. Prescott at the U.C. Davis Medical Center. (Id., p. 17.) Dr. Prescott allegedly

16 determined that plaintiff's symptoms (severe dry and itchy skin, fatigue, tiredness, acne, weight

17 gain, diminished ability to focus, high blood pressure) were the result of hypothyroidism. (Id.)

18 Dr. Prescott recommended that plaintiff receive a I-131 Metastasis Scan and I-131 Radiation

19 Ablation Therapy as soon as possible. (Id.) Dr. Prescott told plaintiff that following almost all

20 thyroidectomies, there was substantial thyroid tissue remaining. (Id.) Dr. Prescott stated that the

21 proper treatment for this condition was radiation therapy, because plaintiff had thyroid cancer.

22 (Id.) Dr. Prescott then forwarded these instructions to the staff at Folsom, including an order that

23 plaintiff receive a low iodine diet before the scan and ablation therapy. (Id.)

24      Plaintiff alleges that when he returned to Folsom, he was seen by Dr. Dunlap who

25 told him that his requests to the prison dietician, associate warden and others for plaintiff to have

26 a low iodine diet had been unsuccessful. (Id., p. 18.) He gave plaintiff a copy of the low iodine

diet guideline summary sheet and told him to do the best he could with that information.  (Id., p. 18.)  Plaintiff alleges that defendant Cardeno had the authority to order the low iodine diet but failed to do so.  (Id., p. 19.)

Plaintiff also alleges that on August 3, 2007, he saw his new primary care physician at Folsom, Dr. Reddy.  (Id., p. 22.)  Plaintiff told Dr. Reddy that Dr. Prescott had told him that he should have a low iodine diet before his next round of radiation and scans and ablation therapy.  (Id.)  Dr. Reddy told plaintiff that she would look into it. (Id.)  On September 5, 2007, plaintiff again saw Dr. Reddy who told him that defendant Cardeno had told her that no low iodine diet would be provided.  (Id., p. 23.)  On September 10, 2007, plaintiff saw Dr. Prescott at the U.C. Davis Medical Center.  (Id., p. 23.)  Dr. Prescott told plaintiff that the I131 scan and ablation therapy would be ineffective without the low iodine diet.  (Id.)

In November 2007, plaintiff was seen by Dr. Reddy who informed plaintiff that he would be transferred to California State Prison-Sacramento for two weeks before the I131 scan and ablation therapy so that he could receive the low iodine diet.  (Id., p. 24.)

In his fourth claim, plaintiff alleges that defendant Cardeno was responsible for allegedly unconstitutional housing conditions during his stay in the Outpatient Housing Unit ("OHU").  In support of this claim, plaintiff alleges that on January 14, 2008, plaintiff was transferred to the OHU at California State Prison-Sacramento to undergo the radiation and ablation therapy.  (Id., p. 24.)  Plaintiff was housed in this unit until February 17, 2008.  Id. During that time he was required to be isolated in order to prevent him from contaminating other people.  (Id.)

In his fifth claim against defendant Cardeno, plaintiff alleges that defendant was responsible for his placement in a cell infested with bed bugs.  In support of this claim plaintiff alleges that upon his return to Folsom on December 11, 2006, after undergoing radiation ablation therapy at California State Prison-Sacramento, he was placed in a cell that was infested with bed bugs.  (Id., p. 19.)

*Analysis – Claim One*

Plaintiff argues that defendant Cardeno acted with deliberate indifference to his serious medical needs by failing to provide him with timely ablation therapy and metastasis scans following his thyroidectomy.  Plaintiff also argues that defendant Cardeno failed to send him to an oncologist immediately following his surgery.  Defendants argue that defendant Cardeno did not act with deliberate indifference in treating plaintiff following surgery.  In support of this claim, defendants refer to defendant Cardeno's declaration attached to their original summary judgment motion which states, in relevant part,

6.  The records disclose that Mr. Hampton arrived at Folsom State Prison (FSP) on September 16, 2005.  On September 16, 2005, he had an initial health screening and on September 19, 2005, he was seen by FSP physician Dr. Torruella to establish thyroid functional status, to be followed up in two to three weeks to review thyroid function studies.  Dr. Torruella ordered labs and Synthroid for three months.  Synthroid supplements the thyroid hormone that Mr. Hampton needs as replacement for the removal of his thyroid gland. [See Exh. A, CDCR 471.]

7.  The first time I saw Mr. Hampton was on October 24, 2005.  During this visit, I noted that Mr. Hampton had a total thyroidectomy on July 25, 2005, for papillary carcinoma intracapsular and no lymph nodes involved.  Mr. Hampton's thyroid stimulating hormone (TSH) on September 19, 2005, was high at 92.75 and Mr. Hampton was started on Synthroid 0.1 mg and I requested another TSH test in one month.  I also reviewed the copy of Mr. Hampton's pathological report by Dr. Walters on July 25, 2005.  The report noted the following: "Left lobe thyroid: Papillary carcinoma, Stage 1.  Right lobe thyroid: chronic thyroid, focal, moderate–no malignancy seen.  Comments: The tumor involving the left lobe is excised.  There is no histologic evidence of extension beyond the thyroid gland capsule." [See Exh. A, CDCR 423-424.]

8.  Based upon my review of the pathological report and my physical exam of Mr. Hampton there was no clinical indication that Mr. Hampton needed a specialist at that time or that he required care for a serious and obvious condition.  There was no evidence that the cancer had spread to his lymph nodes or that the cancer had spread beyond the site of the thyroid operation.  Additionally, Dr. Schuster's note did not indicate that Mr. Hampton's need was immediate.  A recommendation that a patient see a specialist does not indicate a patient is in immediate need of medical care.  My notes reflecting Mr. Hampton's medical evaluation do not indicate that he complained of any pain at this visit. [See Exh. A, CDCR 481 & 486.]

9.  The second time I saw Mr. Hampton was on November 29, 2005[.]  I noted that his TSH came down to 71.85, but was not normal yet, so I increased his dose of Synthroid to 0.15 mg and I requested lab follow up in one month.  My notes

reflecting Mr. Hampton's medical evaluation do not indicate that he complained of any pain at this visit. [See Exh. A, CDCR 465, 479.]

10.  The third and last time I saw Mr. Hampton on December 16, 2005, no lab was done yet, and I noted that it would be done in one week.  I advised for follow up again with lab results and to adjust treatment as necessary.  My notes reflecting Mr. Hampton's medical evaluation do not indicate that he complained of any pain at this visit. [See Exh. A, CDCR 461.]

11.  My review of Mr. Hampton's medical record reveals that from December 16, 2005 through July 7, 2006, he was seen and examined by various other physicians at Folsom State Prison as follows: on January 5, 2006, February 16, 2006, February 24, 2006, and March 16, 2006, by Dr. Dazo; June 27, 2006, and on July 7, 2006 by Dr. Torruella.

12.  On July 7, 2006, as Chief Physician and Surgeon, I requested a routine referral for Mr. Hampton to be seen by an Endocrinology specialist and there was also a Hematology/Oncology referral pending for his one-year follow-up post thyroidectomy. [See Exh. A, CDCR 527.]

13.  On July 26, 2006, Mr. Hampton was seen by FSP medical doctor, Dr. Bal. Dr. Bal charged that Mr. Hampton was seen by UC Davis Oncology on July 25, 2006, for his one-year follow-up after his total thyroidectomy on July 25, 2005, due to papillary cancer.  Mr. Hampton had no complaints.  Oncologist Dr. Rubin, recommended TSH, FT4, COMP now.  In order to get the active amount of active thyroxine in his system, the (FT4) and TSH are tests for the pituitary glands feedback mechanism, which means it tells the thyroid to produce more thyroxine if the level is low and vice versa.  If the TSH is high, it is telling the thyroid to produce more and if it is low, it is telling the thyroid that there is enough or too much.  Dr. Rubin also ordered to stop the Levethmoxine (Levothyroxine) until August 23, 2006.  This medication (supplement) is stopped so that the exact amount of thyroid can be measured that is still present in his neck and to know how much to give him later on so he will have the therapeutic level.  Dr. Bal complied with the oncologists' recommendations and ordered discontinuance of the above medication.  The Oncologists required a one-month follow up to check on the lab results.  Dr. Bal completed a request for services in this regard.  The request for services was signed by Dr. Bal on July 26, 2006, and on July 27, 2006 was approved. [See Exh. A, CDCR 668 & 585.]

14.  On August 29, 2006, Mr. Hampton was again seen by Oncologist Dr. Rubin. On August 30, 2006, Dr. Bal noted no labs at the Oncology appointment.  The next Oncology appointment was scheduled for October 3, 2006. [See Exh. A, CDCR 585 & 665.]

15.  At the October 3, 2006, appointment, Dr. Rubin noted that an appointment was scheduled with UC Davis Endocrinologist Dr. Prescott on October 13, 2006. Dr. Rubin also noted that Dr. Prescott would be organizing Mr. Hampton's thyroid scan and that there was no need to follow up with Dr. Rubin unless Dr. Prescott recommended it. [See Exh. A, CDCR 584.]

16.  The records disclose that Mr. Hampton's medical concerns were addressed

through numerous out-patient consultations by UC Davis Endocrinologist Dr. Prescott. On October 13, 2006, Dr. Prescott saw Mr. Hampton and recommended a I-131 Metastasis scan and I-131 ablation. As Chief Physician and Surgeon, I approved an "urgent" request for a scan and ablation on October 17, 2006. [See Exh. A, CDCR 579.]

17. The records disclose that as a result of the Endrocrinologist consultation with Dr. Prescott, Mr. Hampton was prepared for I-131 scanning and treatment. (The I-131 chemical (contrast) that will adhere to any Thyroid tissue so it can be measured if there is any thyroid tissue active or present.) On December 4, 2006, Mr. Hampton received. 3.9 millicuries of I-131. The scan showed intense focus of tracer activity within the thyroid bed that was compatible with residual recurrent thyroid tissues. On December 6, 2006, Mr. Hampton received I-131, 157.7 millicuries. [See Exh. A, CDCR 564-565.]

18. The records disclose that on December 30, 2006, Mr. Hampton returned for postablation scan showed focal uptake in thyroid bed, consistent with residual functional thyroid tissue or tumor. Mr. Hampton received I-131 on December 20, 2006, and had no obvious adverse effects from the I-131. Mr. Hampton had dry skin and weight gain because of hypothyroidism. Since starting Levothyroxine, there was no obvious problem. The goal was TSH 0.01 to 0.1 dose adjustment of Levothyroxine to achieve goal. It was noted that Mr. Hampton needed thyroglobulin TSH free T4 every three months. It was also noted that in one year, Mr. Hampton will need another I-131 metastases scan. Dr. Prescott discussed with Mr. Hampton that he did have intense uptake in neck area as would be expected, and that this also meant that, at least, his normal thyroid tissue uptook the I-131. Dr. Prescott stated to Mr. Hampton that she could not tell whether it was normal or that the thyroid cancer that was being affected by I-131. Dr. Prescott discussed that they could tell this over time. Dr. Prescott also discussed with Mr. Hampton that part of the treatment now was the suppression of growth of the cancer by suppressing the TSH level. Dr. Prescott discussed that TSH is a growth factor and if the TSH would be in the normal or above-normal range, that this would cause growth of any residual thyroid cancer. Because of this, he was made hyperthyroid to suppress the growth of TSH. Dr. Prescott discussed the adverse effect of being hyperthyroid or over suppressed, including palpitations, emotional liability and muscle weakness. She also discussed that within a year he will need another surveillance to look for any residual evidence of thyroid cancer or metastasis and follow up in four months as a recommendation. (See Exh. A, CDCR 564-566.]

19. The records disclose that Mr. Hampton saw Dr. Prescott on February 28, 2007, and on September 10, 2007. Studies were done on December 5, 2007, and a Thyroid Ultrasound as done on January 11, 2008, and another metastases scan was done on January 25, 2008. Mr. Hampton received I-131 on February 13, 2008, and was treated again on March 19, 2008, with a recommendation of a six month follow up and a repeat thyroid ultrasound of neck and repeat I-131 metastases scan within one year. Mr. Hampton was seen on December 8, 2008, and the repeat surveillance scan was done on March 9, 2009. **The impression of the scan revealed no evidence for residual, recurrent, or metastatic functioning thyroid tissue or tumor**. The report also stated that because of his TSH adequately elevated and the thyroglobulin level and antibodies were negative, and

12

the I-131 metastasis scan did not show any uptake, **the patient did not have evidence for residual thyroid cancer**.  Mr. Hampton's next ultrasound of neck was scheduled for March of 2010. [See Exh. A, CDCR 568, 561-563, 558-560, 27, & 46-49.]

20.  Based upon my observations of Mr. Hampton's symptoms, his physical exams, and his pathological report dated July 25, 2005, and his complaints on the three occasions that he presented to me, he was treated to my best medical assessment at the time.

21.  To the extent that Mr. Hampton contends that there was a delay in being referred to a specialist for treatment and testing, it is my professional opinion, the measures I took in connection with Mr. Hampton's medical care and treatment were reasonably and medically acceptable.  It is my opinion Mr. Hampton did not suffer from any delays in being referred to a specialist.

Cardeno Declaration attached to defendants' original summary judgment motion.

Plaintiff alleges that defendant Cardeno acted with deliberate indifference to his medical needs by not providing him with ablation therapy and metastasis scans sooner.  In conjunction with this claim, plaintiff alleges that defendant Cardeno did not ensure that plaintiff promptly saw an oncologist following his thyroidectomy in July 2005.

At the outset, the undersigned clarifies that the purpose of I-131 ablation therapy is the destruction of any remaining malignant cells.[1]  The purpose of a metastasis scan is to check if a thyroidectomy has left any residual thyroid tissue or tumor.[2]

The following facts regarding this claim are undisputed.  Plaintiff saw an oncologist at UC Davis in July 2006, i.e. one year after his surgery.  After a follow-up appointment on October 3, 2006, with the oncologist, plaintiff was scheduled to see the endocrinologist, Dr. Prescott, on October 13, 2006.  Dr. Prescott recommended a metastasis scan and I-131 ablation therapy.  Plaintiff received ablation therapy and a metastasis scan in December 2006.  Plaintiff saw Dr. Prescott on February 28, 2007, and September 10, 2007.  Studies were

_____

[1]  See http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1905932/ .

[2]  See http://www.mbhs.org/health_topics/nuclear_medicine_exams/metastatic_thyroid_scan.htm.

1   done on December 5, 2007, and a thyroid ultrasound was done on January 11, 2008, and another

2   metastasis scan was done on January 25, 2008.  In February and March 2008 plaintiff again

3   received I-131 ablation therapy with a recommendation of a six month follow up.  Plaintiff was

4   seen on December 8, 2008, and a repeat surveillance scan was done on March 9, 2009.  This scan

5   showed no evidence of residual, recurrent or metastatic functioning thyroid tissue and no

6   evidence of residual thyroid cancer.

7         Plaintiff is alleging that defendant Cardeno caused the delay in his receipt of

8   metastasis scans and ablation therapy.  However, plaintiff has presented no expert evidence that

9   he should have received these treatments sooner than he did.  Assuming there was a delay in

10  plaintiff's receipt of these treatments, plaintiff has presented no evidence that he suffered any

11  injury as a result of the delay.  The purpose of these treatments was to prevent and detect any

12  recurrence of his cancer.  As of March 2009, plaintiff was cancer free.   Accordingly, defendant

13  Cardeno should be granted summary judgment as to this claim.

14        In recommending that defendant Cardeno be granted summary judgment as to this

15  claim, the undersigned acknowledges the numerous letters from the Prison Law Office to

16  plaintiff describing their attempts to assist him in obtaining treatment for his thyroid related

17  medical problems.  These letters are attached as exhibits to the amended complaint.  In these

18  letters, representatives of the Prison Law Office describe their communications with prison

19  officials, including defendant Cardeno, regarding plaintiff's medical care.  (Dkt. 37-3, pp. 32-40

20  of 137.)  The undersigned has reviewed these letters in evaluating the claims raised by plaintiff

21  against defendant Cardeno.  While prison officials may have been prompted to have plaintiff

22  evaluated by Dr. Rubin and Dr. Prescott in 2006 as a result of communications from the Prison

23  Law Office, plaintiff has still failed to demonstrate that he suffered any injury as a result of the

24  alleged delay in his treatment by these doctors.

25        Plaintiff also appears to argue that defendant Cardeno did not properly prescribe

26  levothyroxine, his hormone replacement medicine.  Plaintiff alleges that even when he

complained about the side effects he was experiencing, defendant Cardeno increased his dosage.
In his declaration, defendant Cardeno states the second time he saw plaintiff on November 29,
2005, he noted that his TSH came down to 71.85, but was not normal yet.  Based on this
observation, defendant Cardeno increased plaintiff's dose of Synthroid to 0.15 mg and requested
lab follow up in one month.  Synthroid and Levothyroxine are the same medication.  <u>See</u>
http://www.medicinenet.com/levothyroxine_sodium/article.htm.

Plaintiff has presented no expert evidence that defendant Cardeno's decision to
increase his dosage of Synthroid was not medically warranted.  Accordingly, defendant Cardeno
is entitled to summary judgment as to this claim.

Plaintiff also argues that defendant Cardeno failed to ensure that he be seen by an
oncologist shortly after his surgery.  As discussed above, in support of this claim plaintiff refers
to an entry in his medical records by Dr. Schuster dated July 25, 2005, stating that the plan for
plaintiff post-surgery was for him to receive an oncology consultation.  In his declaration,
defendant Cardeno states that when he examined plaintiff in October 2005 he determined that
plaintiff's need to be seen by a specialist was not immediate.  At best, this evidence demonstrates
a difference of opinion between Dr. Schuster and Dr. Cardeno regarding when plaintiff should
have his oncological follow-up examination.  In addition, plaintiff has also failed to present any
expert evidence demonstrating that he suffered any injury as a result of not receiving the
consultation sooner than one year after the surgery.  Accordingly, defendant Cardeno should be
granted summary judgment as to this claim.

In claim one against defendant Cardeno, plaintiff also argues that defendant
Cardeno was responsible for his blood work not being provided to Dr. Rubin at the UC Davis
Medical Center at his follow-up visit in August 2006.  In his declaration attached to defendants'
supplemental summary judgment motion, defendant Cardeno states that he had no knowledge
that plaintiff's blood work was not provided to Dr. Rubin.  (Dkt. No. 57, Cardeno declaration, ¶
4.)  Dr. Cardeno further states that he was not plaintiff's treating physician in July and August of

1   2006.  (Id.)

2          Plaintiff has presented no evidence linking defendant Cardeno with the failure of

3   his blood work to reach Dr. Rubin.  Accordingly, defendant Cardeno is entitled to summary

4   judgment as to this claim.

5                    *Analysis – Claim Two*

6          Plaintiff alleges that defendant Cardeno failed to ensure that he had a consistent

7   primary care physician.  Defendants argue for summary judgment as to this claim on grounds that

8   there is no evidence that plaintiff received inadequate medical care as a result of not having a

9   consistent primary care physician.  Plaintiff has presented no evidence demonstrating that his

10  failure to have a consistent primary care physician caused him to receive constitutionally

11  inadequate medical care.  Accordingly, defendant Cardeno should be granted summary judgment

12  as to this claim.

13                   *Analysis – Claim Three*

14         Plaintiff alleges that defendant Cardeno failed to ensure that he receive a low

15  iodine diet.  Defendants address this claim in their supplemental summary judgment motion.

16         The undersigned first considers defendants' argument that the low iodine diet was

17  merely recommended as opposed to medically necessary.  In his declaration submitted in support

18  of the supplemental motion, defendant Cardeno states that he was not aware of plaintiff's

19  complaints regarding the low iodine diet until March 2007 when a second level appeal regarding

20  this issue decided that the low iodine diet was only recommended, but not mandated.  (Dkt. 57-1,

21  ¶ 6.)

22         Attached to plaintiff's amended complaint is a letter from Dr. Prescott to Dr.

23  Dunlap at Folsom State Prison dated November 7, 2006.  (Dkt. 37-2, pp. 80-81.)  In this letter,

24  Dr. Prescott addresses plaintiff's need for a low iodine diet before his ablation therapy on

25  December 1, 2006.

26  ////

> It is very important that the patient have as low an iodine as possible. Iodine in his food will limit the update of I-131 into his thyroid cancer. This would mean that his metastasis scan will be suboptimal. It also means that the therapy with the I131 ablation will be suboptimal also. Without the low iodine diet, his thyroid cancer may not be adequately treated.

(Id.)

In his opposition to the supplemental summary judgment motion, plaintiff refers to defendant Cardeno's response to request for admission no. 26 which asks, "Admit that a low-iodine diet is the 'standard of care' for two weeks before the 1131 testing and during the week of the test." (Dkt. 59, p. 33 of 37.) In response, defendant Cardeno "admitted" the matter. (Id.)

Based on the evidence in the record, the undersigned finds that the low iodine diet was not merely recommended. Rather, it was "standard care" for persons receiving ablation therapy and metastasis scans.

The undersigned also observes that in Dr. Cardena's declaration submitted in support of the supplemental summary judgment motion, he states that he is unaware of any prison having the capability of providing a low iodine diet. (Dkt. No. 57-1, ¶ 6.) In the amended complaint, however, plaintiff alleges that in November 2007 Dr. Reddy informed him that he would be transferred to California State Prison-Sacramento for two weeks before the I131 scan and ablation therapy so that he could receive the low iodine diet. Therefore, whether any prison could provide plaintiff with a low iodine diet is a materially disputed fact.

Defendants next argue that there is no evidence that defendant Cardeno knew of plaintiff's need for a low sodium diet. In support of this argument, defendants refer to defendants' declaration attached to their supplemental summary judgment motion. In his declaration, defendant Cardeno states that he was not aware of plaintiff's complaints regarding a low iodine diet until March 2007 when a second level appeal processed on plaintiff's behalf noted plaintiff's complaint and decided a low iodine diet was only recommended. (Dkt. No. 57-1, ¶ 6.)

In his opposition to the supplemental summary judgment motion, plaintiff refers

17

to a First Level Appeal response, dated January 12, 2007, to his administrative grievance complaining that he did not receive the low iodine diet two weeks before he began receiving the ablation therapy.  (Id., p. 20.)  This response states, in relevant part,

> FINDINGS: Dr. Dunlap examined and interviewed you on December 22, 2006. At that time you were provided with an opportunity to explain your appeal issue(s) and to provide any additional information and/or documentation. According to your Unit Health Record (UHR), Dr. Dunlap discussed your concerns with you.  Dr. Dunlap reviewed with you the many attempts that he had made regarding trying to get a modified diet for you prior to your beginning radiation treatment (speaking with the P. Sahota, MD, CMO, FSP, I. Cardeno, M.D. Chief Physician and Surgeon, FSP, and T. Butler, Associate Warden (A), Health Care, FSP.)  Unfortunately, by the time that Dr. Dunlap received an answer on this issue, it was too late to implement the short term dietary restrictions that had been *recommended* by Dr. Prescott.  Of note, the low-iodine dietary food supplements were a *recommendation* only.

(Id.)

According to plaintiff's evidence, Dr. Dunlap sought defendant Cardeno's approval for the low iodine diet before the December 2006 ablation therapy and metastasis scan. This evidence contradicts defendant Cardeno's statement in his declaration that he had no knowledge of plaintiff's need for the diet until March 2007.  Accordingly, when defendant Cardena first had knowledge of plaintiff's need for the diet is a materially disputed fact.

For the reasons discussed above, defendant Cardena should not be granted summary judgment as to plaintiff's claim regarding his failure to receive a low iodine diet before his December 2006 ablation therapy and metastatis scan.

*Analysis – Claims Four and Five*

In claim four, plaintiff alleges that defendant Cardeno was responsible for allegedly unconstitutional housing conditions during his stay in the Outpatient Housing Unit ("OHU").  In claim five, plaintiff alleges that defendant Cardeno was responsible for his placement in a cell infested with bed bugs.  Plaintiff also suggests that defendant subjected him to these conditions in retaliation for his filing grievances regarding his medical care.

Defendants address these claims in their supplemental summary judgment motion.

Defendants argue that defendant Cardeno should be granted summary judgment as to this claim because he was not involved in plaintiff's housing. In support of this argument, defendants refer to defendant Cardeno's declaration attached to the supplemental motion. In this declaration, defendant Cardeno states, in relevant part,

> 7. I have no control over the housing provided to an inmate. That is the domain of the classification committee and is a custody issue, not a medical issue. I did not cause plaintiff to be housed in any condition, let alone an alleged unconstitutional condition. If plaintiff needed a chrono such would have been written by his treating doctor at the time, Dr. Reddy. I was not responsible for plaintiff's placement in a cell infested by bed bugs. I did not know plaintiff's cell had bed bugs. Plaintiff did not complain directly to me of these conditions. I did not take any action towards plaintiff that was motivated by retaliation. I did not contact a custodial officer to influence plaintiff's housing. Any action I took towards plaintiff was based on sound medical principles, CDCR policies and procedures, and my genuine concern for his well being.

(Dkt. 57-1, ¶ 7.)

Plaintiff has presented no evidence demonstrating that defendant Cardeno was responsible for decisions made regarding his housing or housing conditions. Because plaintiff has failed to link defendant to decisions made regarding his housing, defendant should be granted summary judgment as to his Eighth Amendment claims raised in claims four and five.

As for his retaliation claim, "a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 568 (9th Cir. 2005). Because plaintiff offers no evidence of defendant Cardeno's involvement in decisions made regarding his housing, his retaliation claim also fails.

B. Defendant Dazo

*Plaintiff's Allegations*

Plaintiff alleges that defendant Dazo examined him on January 5, 2006. (Dkt. 37-2, p. 8.) At that time, defendant Dazo examined the thyroid hormone test results ordered by

1  defendant Cardeno.  (Id.)  Defendant Dazo told plaintiff that his thyroid hormone level had

2  improved but was still not within target range.  (Id.)  Defendant Dazo prescribed Tylenol for

3  plaintiff's pain, which plaintiff did not receive until January 11, 2006.  (Id, pp. 8-9.)  Defendant

4  Dazo also refused to order tests to determine if the cancer had spread.  (Id., p. 9.)

5          Defendant Dazo saw plaintiff twice in February 2006.  (Id.)  During these visits,

6  defendant Dazo again refused to order additional tests to determine whether the cancer had

7  spread.  (Id.)  Defendant Dazo prescribed hydrocortizone creme and hydroxyzine for plaintiff's

8  itchy skin and changed plaintiff's pain medication to naproxine.  (Id.)  Defendant Dazo also

9  ordered another thyroid hormone test in response to plaintiffs complaints of fatigue, etc.  (Id.)

10          Plaintiff alleges that he saw defendant Dazo on March 16, 2006.  (Id., p. 16.)  At

11  that time, plaintiff again complained of severe dry and itchy skin.  (Id.)  Defendant Dazo

12  determined that the skin condition was not a side effect of his thyroid medication, but an allergic

13  reaction caused by stress.  (Id.)  Defendant Dazo prescribed Vistaril for anxiety and TAC for

14  inflammation.  (Id.)  Plaintiff alleges that this treatment provided some temporary relief for the

15  itching, but it did not relieve his severely dry and itchy skin and scalp.  (Id.)

16          *Analysis*

17          Plaintiff's complaints against defendant Dazo appear to be that he failed to order

18  additional tests to determine whether plaintiff's cancer had spread and did not adequately treat

19  his itchy skin on March 16, 2006.  Defendants move for summary judgment on grounds that

20  defendant Dazo did not act with deliberate indifference to plaintiff's serious medical needs.

21  Defendants refer to defendant Dazo's declaration attached to the summary judgment motion

22  which states, in relevant part,

23          7.  The first time I examined Mr. Hampton was on January 5, 2006, for a follow
            up visit for adjustment of his thyroid medication.  His thyroid stimulating
24          hormone (TSH) level was 22.69 from 71. 85.  Mr. Hampton's TSH level was
            elevated, but his level had decreased from 71.85, suggesting he was responding to
25          treatment.  My order was for Mr. Hampton to continue with the same dosing and
            for a follow up visit. [See Exh. A, CDCR 461 & CDCR 428.]

26

8.  The second time I examined Mr. Hampton was on February 16, 2006.  Mr. Hampton was requiring a different pain medication.  He was afraid of the Tylenol side effects and was also complaining of dry skin.  I observed no eczema (dry skin) or any active lesions.  I prescribed Naproxen and discontinued Tylenol. [See Exh. A, CDCR 615.]

9.  The third time I examined Mr. Hampton was on February 21, 2006.  Mr. Hampton complained of skin rash and dryness.  His skin dryness had improved and he showed no active skin rash.  I prescribed a hydrocortisone cream to apply to affected area and prescribed hydroxyzine for itching. [See Exh. A, CDCR 613.]

10.  The fourth time I examined Mr. Hampton was on March 16, 2006.  I also interviewed him pursuant to his administrative 602 appeal regarding his "itchy" skin.  I charted that Mr. Hampton's skin condition did not result from thyroid medication, but diagnosed it as urticaria (multiple swollen raised areas on the skin that are intensely itchy and last up to 24 hrs) and is most commonly caused by allergies or stress.  I prescribed Vistaril (for anxiety) and Triamcinolone cream for inflammation/treatment of urticaria). [See Exh. A, CDCR 611.]

11.  Based upon my physical examinations of Mr. Hampton, I observed that his neck exam revealed no palpable nodes, no bruit (humming sound), no tumor recurrence and that he had a surgical scar on his neck healed from a previous total thyroidectomy.  There was no clinical indication that Mr. Hampton needed a referral to a specialist at that time, or that he required care for a serious and obvious condition on the four occasions that I saw him.  In my medical opinion, Mr. Hampton did not need to undergo further testing, and it is my opinion that Mr. Hampton did not have any symptoms suggesting he was experiencing side effects from the thyroid medicine.

(Dkt. No. 45-4, ¶ 7-11.)

Plaintiff has provided no expert evidence countering defendant Dazo's declaration concluding that plaintiff did not require a referral to a specialist at the times he examined him.  In any event, assuming defendant Dazo should have made this referral, plaintiff has not demonstrated that he suffered any injury as a result of his delay in seeing the specialists, Dr. Prescott and Dr. Rubin.

Defendant Dazo did not fail to treat plaintiff's itchy skin.  Plaintiff complained of itchy skin the third time defendant examined him.  At that time, defendant prescribed hydrocortisone cream and hydroxyzine.  When plaintiff complained of itchiness at the fourth examination, defendant prescribed Vistaril and Triamcinolone cream.  While these treatments may not have been entirely effective, they did not constitute deliberate indifference.

1    Accordingly, defendant Dazo should be granted summary judgment.

2         C.  Defendant Lee

3         *Plaintiff's Allegations*

4         Defendant Lee saw plaintiff on April 7, 2006.  (Id., p. 9.)  Defendant Lee told

5    plaintiff that his blood pressure and body weight were up and that this was caused, in part, by the

6    naproxine.  (Id.)  Defendant Lee switched plaintiff's pain medication back to Tylenol.  After

7    reviewing the results of plaintiff's thyroid hormone tests, defendant Lee increased plaintiff's dose

8    of levothyroxine.  (Id.)  Defendant Lee ordered a follow-up visit in 45 days and bi-weekly blood

9    pressure checks.  (Id. at 10.)  Plaintiff contends that defendants Lee should have ordered further

10   tests to determine whether plaintiff's cancer had spread.  (Id.)

11        *Analysis*

12        Defendants argue that defendant Lee did not act with deliberate indifference on

13   the one occasion he examined plaintiff.  In support of this argument, defendants refer to the

14   declaration of defendant Lee attached to the summary judgment motion.  In his declaration

15   defendant Lee states, in relevant part,

16        6.  On April 7, 2006, I saw Mr. Hampton when I was assigned to cover Building 2
          Medical Officer line to fill in for another doctor that day.  I was not his regular
17        treating physician.  Mr. Hampton was given an appointment that day to discuss
          the lab results of a thyroid function test.  An MTA was present during the entire
18        visit and assisted me with Mr. Hampton.  The visit lasted at least 15 minutes.  Mr.
          Hampton's blood pressure was high at 139/101 and he weighed 296 pounds and
19        was six feet tall.  When I told him about his high blood pressure, he said "he just
          drank a large cup of coffee."  Mr. Hampton said that he felt well, had no chest
20        pain, no shortness of breath, and no headaches.

21        7.  I performed a focused physical examination and found clear lungs, regular
          heart rate and rhythm, obese and non-tender abdomen with normal active bowel
22        sounds, and normal extremities without edema.  The physical exam of his neck
          showed no goiter or nodules.  His lab reports revealed that his thyroid medication,
23        Levothyroxine, from .150 to 0.162 mg orally daily and ordered repeat thyroid
          function tests and stimulating hormone (TSH) in 75 days.  Because of his elevated
24        blood pressure, I advised Mr. Hampton that he lose weight with a goal of 190
          pounds, and recommended to him to decrease his salt, starch, soup and fat intake.
25        I also told him that Naproxen could cause fluid retention, weight gain, and raise
          his blood pressure, and advised him to stop Naproxen.  I placed him on Enalapril
26        to treat hypertension and re-ordered Tylenol as needed for pain.  The MTA

1

advised plaintiff to come to Building 2 clinic twice a week to have his blood pressure monitored.  I ordered a 30-day follow-up with the building doctor for hypertension.  I also ordered a follow-up appointment with the building doctor in 90 days to discuss and treat his thyroid condition.  A true and correct copy of my interdisciplinary progress notes dated April 7, 2006, is attached as Exhibit A.

2

3

4

8.  Based upon the information available to me at the time, my physical exam of Mr. Hampton did not reveal any indication that Mr. Hampton needed a referral to a specialist oncologist at that time.  Mr. Hampton did not have a serious and obvious condition needing immediate medical care on the one day that I saw him regarding his TSH results.

5

6

7    Lee Declaration attached to defendants' summary judgment motion.

8             Defendants argue that defendant Lee did not act with deliberate on April 7, 2006.

9    Plaintiff had the appointment with defendant Lee on that date solely to discuss the lab results of a

10   thyroid function test.  Defendants contend that defendant Lee performed a physical examination

11   and did not note any abnormalities.  In Dr. Lee's medical opinion, there was no indication that

12   plaintiff needed a referral to an oncologist.

13             Plaintiff has presented no expert evidence countering defendant Lee's declaration

14   that plaintiff did not require a referral to a specialist at the times he examined him.  In any event,

15   assuming defendant Lee should have made this referral, plaintiff has not demonstrated that he

16   suffered any injury as a result of his delay in seeing the specialists, Dr. Prescott and Dr. Rubin.

17   Accordingly, defendant Lee should be granted summary judgment.

18             D.  State Law Claim

19             Plaintiff argues that defendants violated California Government Code § 845.6

20   which provides,

21

Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, except as otherwise provided by Sections 855.8 and 856 [relating to diagnosis and treatment and confinement for mental illness and addiction], a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care. Nothing in this section exonerates a public employee who is lawfully engaged in the practice of one of the healing arts under any law of this state from liability for injury proximately caused by malpractice or exonerates the public entity from its obligation to pay

22

23

24

25

26

23

1     any judgment, compromise, or settlement that it is required to pay under
      subdivision (d) of Section 844.6.

2

3   Cal. Govt. Code § 845.6

4          This code section imposes an obligation for public entities to help when there is

5   actual or constructive knowledge of a need for immediate medical care—i.e. there is a duty of

6   reasonable action to summon medical care.  Johnson v. County of Los Angeles, 143 Cal.App.3d

7   298, 191 Cal.Rptr. 704 (1983).  "Liability ... is limited to serious and obvious medical conditions

8   requiring immediate care."  Watson v. State, 21 Cal.App.4th 836, 841, 26 Cal.Rptr.2d 262 (1993)

9   (citations omitted).

10         Plaintiff's allegations do not establish that any of his medical conditions required

11  immediate care.  Nor does plaintiff allege that any defendant failed to summon medical care.

12  Accordingly, plaintiff has failed to state a claim under Government Code § 845.6.  Accordingly,

13  defendants should be granted summary judgment as to this claim.

14                      E.  Injunctive Relief

15         In their supplemental summary judgment motion, defendants move for summary

16  judgment as to plaintiff's claims for injunctive relief on grounds that he is no longer incarcerated

17  at Folsom State Prison where the alleged deprivations occurred.  Plaintiff is now incarcerated at

18  the Sierra Conservation Center ("SCC") in Jamestown, California.  None of the defendants are

19  located at SCC.  Accordingly, defendants should be granted summary judgment as to plaintiff's

20  claims for injunctive relief as they are moot.  See Weinstein v. Bradford, 423 U.S. 147, 149

21  (1975); Dilley v. Gunn, 64 F.3d 1365, 1368-69 (9th Cir. 1995).

22         Accordingly, IT IS HEREBY RECOMMENDED that defendants' summary

23  judgment motions (Dkt. Nos. 45 and 57) granted but for the claim that defendant Cardeno

24  violated plaintiff's Eighth Amendment right to adequate medical care by failing to ensure that he

25  receive a low iodine diet before his December 2006 ablation therapy and metastasis scans.

26         These findings and recommendations are submitted to the United States District

Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  August 31, 2010

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

hamp966.sj